## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

STANLEY HUMPHREYS,

        Plaintiff,

        v.

VINTAGE IRONWORKS, L.L.C.,
and WILLIAM WALTERS III,

        Defendants.

_____/

CASE NO.:

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, STANLEY HUMPHREYS ("Plaintiff" or "Mr. Humphreys"), by and through his undersigned counsel, hereby complains of the Defendants, VINTAGE IRONWORKS, L.L.C. ("Defendant Ironworks") and WILLIAM WALTERS III ("Defendant Walters") (hereinafter referred to as the "Defendants" collectively), and alleges as follows:

## INTRODUCTION

1. Plaintiff, Stanley Humphreys, brings this action against his former employer, Defendants VINTAGE IRONWORKS, L.L.C. and WILLIAM WALTERS III, to redress Defendants' willful failure to compensate Mr. Humphreys for overtime wages lawfully owed to him, and to remedy the unlawful retaliation he suffered as a consequence of opposing Defendants' wage violations.

1

2.     This action is brought pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

## PARTIES

3.     Plaintiff, STANLEY HUMPHREYS, is an individual male residing in Seminole County, Florida.

4.     Defendant, VINTAGE IRONWORKS, L.L.C. ("Defendant Ironworks"), is a Florida Limited Liability Company, with its principal place of business located at 671 Newburyport Avenue, Altamonte Springs, Florida 32701.

5.     Defendant William Walters III is an individual male residing in Seminole County, Florida and the owner of Defendant Ironworks.

6.     At all relevant times, Defendant Walters exercised operational control over Defendant Ironworks and its employees, including the authority to hire, fire, and discipline employees of Defendant Ironworks, including Plaintiff.

7.     At all relevant times, Defendant Ironworks and Defendant Walters were Plaintiff's joint and/or sole employer within the meaning of 29 U.S.C. § 203(d).

8.     Defendants acted in the interest of an employer toward Plaintiff at all times material herein, including hiring and terminating Plaintiff, controlling his work schedule and conditions of employment, determining his

2

rate and method of payment, and maintaining his employment records.

9.  Defendant Walters owns 100% of Defendant Ironworks and acts as its sole managing member.

10.  Defendant Walters actively directed Defendant Ironworks' financial decisions and management policies, including exercising direct oversight over payroll practices, personally determining the method by which employees were compensated, and devising the bifurcated payment scheme that routed Plaintiff's overtime wages through a shell entity to avoid paying the statutory overtime premium.

11.  Defendant Walters exerted direct control over staffing decisions, including personally negotiating Plaintiff's return to employment, setting the terms of his rehire, and making the decision to terminate Plaintiff's employment.

12.  Defendant Walters directly influenced and determined the compensation of individual employees, including personally setting Plaintiff's rate of pay on multiple occasions, unilaterally altering the structure of Plaintiff's overtime compensation, and instructing Plaintiff to create a corporate entity for the sole purpose of receiving off-the-books overtime payments.

13.  Defendant Walters exercised day-to-day control over the conditions of Plaintiff's employment, including determining his work schedule,

assigning his duties, directing the manner in which work was performed, and unilaterally assigning Plaintiff responsibility for payroll processing, timeclock installation, and other administrative functions beyond the scope of his position.

14.     Defendant Walters' involvement in the employment practices for Defendant Ironworks' employees was not merely passive or titular, as he actively directed and managed the business affairs of Defendant Ironworks, including decisions that led to the FLSA violations, and was responsible for Defendant Ironworks' non-compliance with the FLSA. Defendant Walters' direct involvement in day-to-day operations and decision-making processes makes him individually liable for the FLSA violations alleged herein.

15.     Plaintiff was dependent upon Defendants for his employment, and Defendants collectively supervised, directed, and controlled Plaintiff's day-to-day responsibilities and used Plaintiff's work in furtherance of their business operations.

16.     Both Defendant Ironworks and Defendant Walters are jointly and severally liable for the FLSA violations alleged herein.

17.     At all relevant times, Defendants were "employers" within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(d).

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 29

U.S.C. § 216(b). This action is authorized and instituted pursuant to 29 U.S.C. § 216(b).

19.    Venue is proper in this Court under 28 U.S.C. §1391(b) because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Middle District of Florida. The Defendants were and are still located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## FACTUAL ALLEGATIONS

### I.    FLSA COVERAGE

20.    At all relevant times, Defendant Ironworks was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. § 203(s)(1)(A).

21.    Defendant Ironworks creates custom metal fabrications using materials, specifically steel, iron, and welding consumables, that have moved in or were produced for interstate commerce.

22.    At all relevant times, Defendant Ironworks had employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person.

23.    Upon information and belief, at all relevant times, Defendant Ironworks has had an annual gross volume of sales made or business done of

not less than $500,000.00 (exclusive of excise taxes at the retail level that are separately stated).

24. At all relevant times, Defendant Ironworks utilized the instrumentalities of interstate commerce to conduct its daily business operations, including soliciting and accepting funds from non-Florida sources, utilizing interstate banking and credit card processing systems to transmit funds across state lines, transmitting electronic communications and design specifications across state lines, and purchasing insurance policies and other operational services from out-of-state providers.

25. In addition to enterprise coverage, Plaintiff was individually engaged in commerce and in the production of goods for commerce within the meaning of 29 U.S.C. § 207(a)(1). In the regular course of his employment, Plaintiff handled goods and materials, including steel, iron, and welding consumables, that had moved in interstate commerce. Plaintiff further utilized instrumentalities of interstate commerce, including electronic communications and interstate shipping channels, in the performance of his duties.

## II. PLAINTIFF'S EMPLOYMENT

26. Defendants employed Plaintiff as a Welder and Fabricator from approximately January 30, 2023, through August 15, 2025.

27. At all times material, Plaintiff was considered a satisfactory employee and had no history of disciplinary action.

6

28.    Plaintiff's primary duties consisted of manual labor, specifically cutting, grinding, welding, and installing iron and steel structures.

29.    At all relevant times, Plaintiff was compensated on an hourly basis, not on a salary basis, and therefore did not satisfy the salary basis requirement for the executive exemption under 29 C.F.R. § 541.602.

30.    Despite Plaintiff's role as a Welder and Fabricator, Defendants sought to characterize Plaintiff's position as managerial in an attempt to avail themselves of the executive exemption under the FLSA and avoid their obligation to pay overtime. Notwithstanding this characterization, Plaintiff possessed none of the hallmarks of managerial authority.

31.    Plaintiff lacked the authority to hire, fire, promote, or discipline employees; to set wages or determine compensation structures; or to create or implement management policies or procedures. Plaintiff likewise lacked the authority to determine fabrication techniques or production methods, to commit Defendant Ironworks to matters having significant financial impact, or to approve overtime or allocate labor hours.

32.    Plaintiff did not customarily and regularly direct the work of two (2) or more full-time employees or their equivalent. To the extent Plaintiff provided any input regarding the work of other employees, such input was not given particular weight by Defendants in any hiring, firing, advancement, promotion, or other change-of-status decision.

7

33. Plaintiff did not exercise any meaningful degree of independent discretion in the exercise of his duties. Through detailed rules, guidelines, and standard operating procedures, Defendant Walters maintained strict control, oversight, and direction over the operation of the fabrication facility, and Plaintiff was required to follow those directives without deviation. At no time did Plaintiff possess independent discretionary authority to depart from Defendants' established policies, practices, or procedures.

34. Upon commencing his employment, Plaintiff's initial hourly rate of pay was $18.00 per hour.

35. In or around March 2023, Plaintiff submitted a notice of resignation to accept employment with a competitor.

36. When Plaintiff attempted to collect his final paycheck in March 2023, the check Defendants issued was returned for insufficient funds.

37. To induce Plaintiff to return to employment with Defendant Ironworks, Defendant Walters verbally agreed to match the competitor's rate of $24.00 per hour.

38. Plaintiff accepted Defendant Walters' offer and resumed his employment with Defendant Ironworks at the rate of $24.00 per hour.

39. In or around August 2023, Defendant Walters pressured Plaintiff to resign from his secondary employment, representing that Defendant Ironworks needed Plaintiff to work consistent overtime hours. Plaintiff agreed

8

to dedicate his full-time availability to Defendant Ironworks on the condition that Defendants would provide consistent overtime opportunities. In reliance on these assurances, Plaintiff resigned from his secondary employment and became exclusively dependent on Defendants for his income.

40.    During the early period of Plaintiff's rehire, Defendants properly compensated Plaintiff for overtime hours by paying one and one-half times Plaintiff's regular rate on W-2 payroll, in compliance with the overtime requirements of the FLSA, 29 U.S.C. § 207(a)(1).

41.    In late 2023, Defendant Walters explicitly informed Plaintiff that calculating and paying weekly overtime premiums was "inconvenient" for Defendants.

42.    Defendants subsequently implemented a bifurcated payment scheme designed to evade FLSA overtime requirements and federal tax obligations.

43.    Under this scheme, Defendants paid Plaintiff via official W-2 payroll checks for the first forty (40) hours of work in a workweek.

44.    Defendants capped the hours reported on Plaintiff's W-2 pay stubs at exactly forty (40) hours, regardless of the actual hours Plaintiff worked.

45.    For hours worked in excess of forty (40) hours in a workweek, Defendants paid Plaintiff via separate, non-payroll checks without withholding federal income taxes, FICA, or Medicare contributions.

9

46.     Defendant Walters instructed Plaintiff to create a corporate entity, "Stanley Architectural Metalworks," for the sole purpose of receiving off-the-books payments for overtime hours that Plaintiff worked as an employee of Defendants. At all times, Plaintiff remained an employee of Defendants performing the same duties under the same conditions regardless of the payment channel used.

47.     Plaintiff created this entity solely to comply with Defendant Walters' payment instructions. At no time did Plaintiff utilize Stanley Architectural Metalworks to market services to the general public, solicit business, perform work for any other client, or operate as an independent business in any capacity. Plaintiff had no opportunity for profit or loss independent of his hourly wage and exercised no entrepreneurial control over any aspect of his work.

48.     Stanley Architectural Metalworks did not perform independent work for Defendants and existed exclusively as a conduit for Defendants' off-the-books wage payments.

49.     Plaintiff performed the same work, at the same location, under the same supervision, and using the same tools and equipment owned by Defendants, both before and after the creation of this entity. Despite the creation of Stanley Architectural Metalworks, Plaintiff continued to be treated

as an employee of Defendants in all respects rather than as an independent business.

50. Defendants failed to pay the statutory overtime premium of one and one-half times Plaintiff's regular rate for these hours. Instead, Defendants paid these overtime hours at straight-time rates or arbitrary flat amounts.

51. By classifying Plaintiff's overtime payments as purported independent contractor compensation rather than reporting them through payroll, Defendants shifted their share of FICA tax obligations onto Plaintiff. Plaintiff was required to bear the full self-employment tax burden on wages that should have been reported as employee compensation, effectively reducing Plaintiff's actual compensation below the amounts owed.

52. Plaintiff's hourly rate was incrementally increased to $28.00 and then $30.00 per hour during 2024, and to $32.00 per hour in January 2025. The bifurcated payment scheme continued through each of these increases.

53. Throughout Plaintiff's employment, Defendants maintained the bifurcated payment scheme on a consistent and recurring basis. Plaintiff regularly worked in excess of forty (40) hours per workweek, at times exceeding fifty (50) and sixty (60) hours in a single workweek.

54. By way of example, for the workweek ending January 24, 2025, Plaintiff worked approximately seventy-six (76) hours. Defendants issued a W-2 paycheck for that period reflecting exactly forty (40) hours at Plaintiff's

11

regular rate and paid the remaining overtime hours through the off-the-books arrangement at straight-time rates, without the required overtime premium.

55.     Similarly, for the workweek ending February 14, 2025, Plaintiff worked approximately seventy-six (76) hours. Defendants again issued a W-2 paycheck reflecting exactly forty (40) hours and routed the remaining overtime hours through the same off-the-books arrangement, denying Plaintiff over thirty-six (36) hours of overtime premium pay in a single workweek.

56.     For each such workweek, Defendants issued a W-2 paycheck reflecting only forty (40) hours worked, regardless of Plaintiff's actual hours.

57.     Defendants paid Plaintiff's remaining overtime hours through separate checks routed to Plaintiff or to the shell entity at straight-time rates or arbitrary flat amounts, without the overtime premium required by 29 U.S.C. § 207(a)(1).

58.     In May 2025, following the resignation of Defendants' HR and payroll administrator, Defendant Walters assigned Plaintiff responsibility for payroll data entry, including installing a new timeclock system, printing timesheets, manually adjusting employee time entries, and processing payroll. Plaintiff performed these tasks under Defendant Walters' direct supervision and direction.

59.     Based on his review of Defendants' payroll records, Plaintiff was the only employee subjected to the bifurcated W-2/1099 payment scheme, while

other employees whose records Plaintiff reviewed received proper W-2 overtime pay.

60.     By way of example, in or around June 2025, during Plaintiff's performance review, Defendant Walters sought to falsely label Plaintiff as a Fabrication Manager in an effort to avail Defendants of the executive exemption under the FLSA. In response, Plaintiff objected to the false title, to Defendants' unlawful attempt to apply the exemption, and to Defendants' continuing refusal to pay overtime at the statutory premium rate.

61.     Plaintiff expressly objected to being required to work overtime at straight-time rates, including on one occasion stating to Defendant Walters that if Defendants required Plaintiff to perform managerial duties, Plaintiff's compensation had to reflect a true salary that accounted for his overtime hours rather than the bifurcated straight-time scheme Defendants had implemented.

62.     On another occasion, Plaintiff objected to Defendants' unlawful compensation scheme and informed Defendant Walters that the off-the-books payment scheme was lowering Plaintiff's reported income and interfering with his ability to qualify for a home mortgage. Plaintiff further demanded that all of his wages, including overtime, be reported on a W-2 in accordance with the law.

63.     In response to Plaintiff's opposition to Defendants' unlawful compensation practices, Defendant Walters failed to take any corrective or

remedial action to remedy Defendants' non-compliance with the FLSA and instead retaliated against Plaintiff.

64. On August 14, 2025, Plaintiff sent a written communication to Defendant Walters opposing the changes Defendants had made to the terms and conditions of his employment, including the imposition of additional duties without compensation and Defendants' ongoing pattern of unlawful employment practices.

65. Plaintiff's repeated opposition to and objections against Defendants' unlawful compensation practices, as described herein, constituted protected activity under the FLSA, 29 U.S.C. § 215(a)(3).

66. On August 15, 2025, Plaintiff entered Defendants' premises on a pre-approved day off to collect his weekly paycheck. Plaintiff asked Defendant Walters whether he had read the August 14 communication and requested to discuss it. Defendant Walters refused.

67. On August 15, 2025, Defendants unlawfully terminated Plaintiff's employment.

68. Defendants' termination of Plaintiff was in retaliation for Plaintiff's opposition to Defendants' unlawful compensation practices.

69. Plaintiff's termination occurred less than twenty-four (24) hours after his August 14, 2025, communication and in close temporal proximity to his ongoing opposition to Defendants' unlawful compensation practices.

14

70. Plaintiff never received his final W-2 paycheck for the pay period ending August 9, 2025.

71. Defendants intentionally and repeatedly engaged in a pattern and practice of violating the FLSA. Defendants willfully failed to pay Plaintiff premium overtime wages for hours worked in excess of forty (40) per workweek. Defendants willfully misclassified Plaintiff's overtime hours as "independent contractor" payments via a shell entity to evade tax and wage liabilities. Defendants willfully failed to make, keep, and preserve accurate records of the hours worked by Plaintiff, as required by 29 U.S.C. § 211(c).

72. By capping Plaintiff's W-2 pay stubs at forty (40) hours regardless of actual hours worked and routing remaining hours through off-the-books payments, Defendants maintained records that were materially inaccurate and failed to satisfy the recordkeeping requirements of 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2. Because Defendants' own records do not accurately reflect the hours Plaintiff actually worked, Plaintiff need only produce sufficient evidence to show the amount and extent of his uncompensated work as a matter of just and reasonable inference, and the burden shifts to Defendants to negate the reasonableness of that inference.

73. Defendants were aware of the overtime and recordkeeping requirements of the FLSA, 29 U.S.C. § 207 and § 211(c), and recklessly failed to investigate whether their bifurcated payment scheme violated those

15

provisions. Defendants' conduct was a deliberate scheme to reduce labor costs at the expense of Plaintiff's statutory rights, and as a result of this willful conduct, the three-year statute of limitations applies pursuant to 29 U.S.C. § 255(a).

74.    Defendants' failure to pay overtime wages was not in good faith, nor did Defendants have reasonable grounds for believing their act or omission was not a violation of the FLSA.

75.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages in the amount of his unpaid overtime compensation.

76.    Plaintiff is entitled to liquidated damages equal to the amount of his unpaid overtime compensation pursuant to 29 U.S.C. § 216(b).

77.    As a direct and proximate result of Defendants' retaliatory termination, Plaintiff has suffered and continues to suffer lost wages, lost benefits, and emotional distress.

78.    Plaintiff has been required to retain the undersigned counsel to represent him in this action and is obligated to pay a reasonable fee for their services.

79.    Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

## CAUSES OF ACTION
### COUNT I
### 29 U.S.C. § 207(a)(1)
### FLSA UNPAID OVERTIME WAGES

80.    Plaintiff reincorporates Paragraphs 20 through 79 as if fully set forth herein.

81.    At all times material, Defendants were Plaintiff's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

82.    At all times material, Plaintiff was covered by the FLSA both through Defendants' status as an enterprise engaged in commerce under 29 U.S.C. § 203(s)(1)(A) and through Plaintiff's individual engagement in commerce and in the production of goods for commerce under 29 U.S.C. § 207(a)(1).

83.    Under 29 U.S.C. § 207(a)(1), "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

84.    At all times material, Plaintiff regularly worked in excess of forty (40) hours per workweek, including, by way of example, workweeks ending

17

January 24, 2025 and February 14, 2025, during each of which Plaintiff worked approximately seventy-six (76) hours.

85.   At all times material, Defendants willfully violated the FLSA by failing to compensate Plaintiff at the statutory rate of one and one-half times his regular rate for all hours worked in excess of forty (40) in a workweek.

86.   Specifically, Defendants willfully evaded the overtime requirements of 29 U.S.C. § 207 by implementing a bifurcated payment scheme, wherein Plaintiff's overtime hours were paid via separate checks issued to a shell entity at straight-time rates or flat amounts, rather than the required premium rate.

87.   Defendants' bifurcated payment scheme further caused Plaintiff to bear the employer's share of FICA taxes on overtime wages that should have been reported and paid as W-2 compensation, effectively reducing Plaintiff's actual compensation below the amounts required by the FLSA.

88.   As a direct and proximate result of Defendants' failure to pay the statutory overtime premium, Plaintiff has suffered damages when he was denied overtime wages for a substantial number of hours worked.

89.   Defendants' conduct was willful and intentional. Defendants knew of the FLSA's overtime requirements, as evidenced by their initial compliance in early 2023 and Defendant Walters' explicit acknowledgment that calculating and paying overtime was "inconvenient" for Defendants. Despite

18

this knowledge, Defendants recklessly or intentionally adopted a fraudulent payment scheme to avoid future liability. Defendants further demonstrated willfulness by maintaining payroll records that systematically misrepresented Plaintiff's actual hours worked.

90.    Defendants either knew from prior experience or recklessly failed to investigate whether their failure to pay Plaintiff the proper overtime premium violated the FLSA, and then failed to timely correct their violations.

91.    Pursuant to 29 U.S.C. § 216(b), Plaintiff is entitled to payment of all overtime wages that Defendants were required to pay, which Defendants improperly retained, and an additional equal amount in the form of liquidated damages.

92.    Defendants' failure to pay Plaintiff overtime wages was not in good faith, and Defendants had no reasonable grounds for believing that their conduct was not a violation of the FLSA. Accordingly, Defendants cannot establish an affirmative defense to liquidated damages under 29 U.S.C. § 260.

93.    Based on preliminary estimates derived from the established duration of the bifurcated payment scheme and the typical volume of overtime hours Plaintiff worked, the total amount of unpaid wages unlawfully retained by Defendants could easily exceed $50,000.00. This estimate reflects the consistent suppression of Plaintiff's earned overtime compensation below the

level required by the FLSA, and is subject to adjustment upon production and review of Defendants' complete payroll records.

94.    The employment records for Plaintiff from which the Defendants' liability can be ascertained are within the exclusive custody and control of the Defendants.

95.    At this time, the total amounts are unknown and are to be determined upon further investigation.

96.    Defendants further violated their obligations under 29 U.S.C. § 211(c) by failing to make, keep, and preserve accurate records of the hours worked by Plaintiff each workday and each workweek, as required by 29 C.F.R. § 516.2.

97.    Defendants' W-2 payroll records systematically reflected only forty (40) hours per workweek regardless of Plaintiff's actual hours worked. Defendants maintained no accurate record of the overtime hours paid through the off-the-books arrangement. As a result of Defendants' failure to maintain accurate records, Plaintiff's reasonable reconstruction of hours worked gives rise to a just and reasonable inference of damages, and Defendants bear the burden of rebutting that inference.

98.    Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

## COUNT II
## 29 U.S.C. § 215(a)(3) & §216(b)
## FLSA RETALIATION

99.   Plaintiff reincorporates Paragraphs 20 through 79 as if fully set forth herein.

100.   At all times material, Defendants were Plaintiff's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

101.   Under 29 U.S.C. § 215(a)(3), it is unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act..."

102.   Plaintiff engaged in protected activity under the provisions of the FLSA, 29 U.S.C. § 215(a)(3), on several occasions throughout his employment, including but not limited to the activities described herein.

103.   Defendants were aware of Plaintiff's protected activities, including Plaintiff's objections during his performance review and Plaintiff's ongoing objections to Defendants' bifurcated payment scheme, the 1099 payment arrangement, and Defendants' failure to pay overtime at the required premium rate, prior to terminating Plaintiff's employment.

104.   Plaintiff's protected activities included, but were not limited to: (1) Plaintiff's verbal objections during his performance review to Defendants' false labeling of Plaintiff as a Fabrication Manager, Defendants' unlawful attempt

to avail themselves of the executive exemption under the FLSA, and Defendants' continuing refusal to pay overtime at the statutory premium rate; and (2) Plaintiff's ongoing objections to Defendants' bifurcated payment scheme and 1099 payment arrangement, including Plaintiff's demand that all of his wages, including overtime, be reported on a W-2 in accordance with the law.

105.    In response to Plaintiff's opposition to Defendants' unlawful employment practices, Defendants retaliated against Plaintiff.

106.    Defendants retaliated against Plaintiff by engaging in conduct including, but not limited to: (1) assigning Plaintiff additional duties without compensation, including payroll and HR responsibilities beyond the scope of his position; (2) altering the terms and conditions of Plaintiff's employment without his consent; (3) refusing to meet with Plaintiff to address his workplace concerns despite repeated requests; (4) unlawfully terminating Plaintiff's employment; and (5) failing to pay Plaintiff his final paycheck for the pay period ending August 9, 2025.

107.    Defendants took the above-mentioned materially adverse actions against Plaintiff because of his protected activities.

108.    Defendants' retaliatory actions were causally connected to Plaintiff's protected activities, as established by the close temporal proximity between Plaintiff's opposition to Defendants' unlawful compensation practices

22

and the termination of his employment on August 15, 2025, the alteration of the terms and conditions of Plaintiff's employment in the months preceding his termination, Defendants' refusal to address Plaintiff's workplace concerns, and Defendants' withholding of Plaintiff's final paycheck for the pay period ending August 9, 2025.

109.   Any reasonable employee in Plaintiff's position would be dissuaded from opposing unlawful pay practices or asserting their rights under the FLSA if they knew that they would be subjected to the treatment described herein.

110.   Defendants' alleged basis for the adverse employment actions is pretextual and has been asserted only to cover up the retaliatory nature of Defendants' conduct.

111.   As a direct and proximate result of Defendants' retaliatory conduct in violation of the FLSA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages, including back pay and front pay, lost benefits, and other compensation which his employment entailed. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, humiliation, loss of dignity, and other intangible damages.

112.   Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

23

113. Defendants willfully and intentionally retaliated against Plaintiff for his protected activities under the FLSA. Defendants' willfulness is evidenced by the unlawful termination of Plaintiff's employment in close temporal proximity to Plaintiff's protected activity and the withholding of Plaintiff's final paycheck, each of which occurred in direct response to Plaintiff's opposition to Defendants' unlawful pay practices.

114. Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests this Court to enter judgment against the Defendants for all damages suffered by the Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of Defendants' conduct in violation of the FLSA.

Dated: April 17, 2026,

                                       Respectfully submitted,

                                       */s/ Kyle T. MacDonald*

Kyle T. MacDonald, Esq.
Florida Bar No.: 1038749

**MACDONALD LAW, PLLC**
420 SW 7th Street, Suite 1118
Miami, FL 33130
Tel: (786) 500-9675
Email: kyle@macdonaldemploymentlaw.com